570 P.2d 812

E. V. LOVE, Appellant,

v.

DOUBLE "AA" CONSTRUCTORS, INC., an Arizona Corporation, Appellee.

No. 1 CA–CIV 3263.

Court of Appeals of Arizona, Division 1, Department A.

Oct. 18, 1977.

**42**

Stewart & McLean, Ltd. by Harry A. Stewart, Jr., Phoenix, for appellant.

Charles A. Stanecker, Phoenix, for appellee.

## OPINION

NELSON, Presiding Judge, Department A.

In 1972, E. V. Love, appellant (Love) contracted with Double "AA" Constructors, Inc., appellee (Double "AA") for the remodeling and reconstruction of a building at the Arizona State Fair Grounds in Phoenix, Arizona. Upon completion of the work, Double "AA" submitted its bill for $108,474.00, less $20,000 already paid on account. Love refused to pay any amount over $50,000, alleging that this was an agreed-to maximum with the architect, James G. Fiakas,[1] and that Double "AA" either knew, or should have known this, or at least breached the contract in several different respects, most of which would have resulted in Double "AA" discovering Fiakas' lack of authority.

Double "AA" sued Love for the balance due on the contract. Love eventually paid the additional $30,000, bringing the total payments to the $50,000 he claimed was the proper price. A jury awarded Double "AA" $47,626.00 as the balance due for the work done. Love thereafter perfected this appeal.

Although the parties initially presented four questions for review, one was essentially withdrawn or conceded at oral argument, and in the Court's view, even if no such concession had been made, there are really only two questions presented:

(1) Does the evidence support the verdict?

(2) Are there any jurisdictional defects, vis-a-vis Double "AA" 's contractor's license or licenses, to prevent recovery? We believe there are no jurisdictional defects in the lawsuit on the contract and that the evidence fully supports the verdict and therefore affirm the judgment of the trial court.

---

1. Fiakas was an original party to the suit below, but was dismissed because of an arbitration clause with Love, and is not a party to this appeal.

EVIDENCE

Generally speaking, where the evidence is in conflict and there is reasonable evidence to support the trial court's conclusions and the verdict of the jury, this Court will not substitute its judgment for that of the trial court and jury. *Desruisseau v. Isley*, 27 Ariz.App. 257, 553 P.2d 1242 (1976); *E–Z Livin' Mobile Homes, Inc. v. Tommaney*, 27 Ariz.App. 11, 550 P.2d 658 (1976). Viewed in this light, the evidence certainly supports the jury's verdict on the contract. While it is very clear that Love did not initially contemplate that the cost should exceed $50,000, it is equally clear he deliberately [2] did not insist a maximum cost figure be included in the contract and he continued to insist the building be completed in time for the 1972 Arizona State Fair in late October.

Joseph Schwann, the principal owner of Double "AA", dealt exclusively with Fiakas, the architect, and did not meet Love until late October 1972, just before the work was concluded. Since the contract itself did not state a maximum figure, and since it is conceded that Schwann was never informed of a $50,000 maximum figure, the authority of the architect is the key issue.

██ The contracts involved between Love and Fiakas and between Love and Double "AA" are standard form contracts, prepared by Fiakas and signed by all the parties. They contained provisions for drawings and cost estimates at every stage, with Love to be informed and consulted. The owner's approval was required prior to the bidding phase of the contract. The final plans were required to be approved by Love. Changes were required to be in writing. Although Love was aware of some preliminary drawings and the general nature of the work to be done, it is undisputed that he was not furnished cost estimates, final plans, including a change which required costly expenditures for steel, nor informed of the waiver of the bid requirements regarding subcontractors and materials. Because of the context in which the contract between Love and Double "AA"

arose, and the limited contact available with Love during the critical time periods in question, coupled with Love's insistence upon completion by Fair opening, we think there is ample evidence to support Fiakas' authority to waive these key provisions on Love's behalf.

All parties agreed that parol evidence was admissible on these issues. *See Crone v. Amado*, 69 Ariz. 389, 214 P.2d 518 (1950). A careful reading of the testimony of Love, Fiakas and Schwann supports the following scenario.

Love had been a food concessionaire at the Arizona State Fair for some 30 years prior to this incident. In late 1971 and early 1972 the Arizona State Coliseum and Exposition Board, which operates the State Fair and owns the building in question, had discussions with Love regarding the possible remodeling of the building to be used as a permanent cafeteria. The Board had no money, but if Love would do the remodeling, they would lease him the building for five years, with an option for another five years. All of this was oral, although reflected in the minutes of the meetings of the Coliseum Board. Love said he would not spend more than $50,000 to complete the work.

In June of 1972, Love was introduced to Fiakas as a possible architect. Preliminary discussions were held at that time regarding how Love wanted the building remodeled. Fiakas agreed to do some preliminary drawings in accordance with what Love had described to him at the site. In July, when Love was again in Phoenix, he reviewed the preliminary drawings with Fiakas and made additional suggestions and changes. On July 14, 1972 Fiakas mailed the completed drawings and three copies of the standard form architects and owners contract to Love for his signature. Love apparently never received this mail.

At this point it is important to understand Love's lifestyle as a food concessionaire. Although Love's permanent residence

**2.** His avowed purpose for this inaction was that if the maximum was in there, it would be

spent and he thought the project might be done for even less.

is at Rocky Comfort, Missouri, he is almost never there. Except for five or six weeks a year, he travels to various shows, fairs and rodeos, where he does his work. When Fiakas received no response from Love in July, he made efforts to contact him so he could begin the work. After several attempts Fiakas contacted Love by phone. Another set of contracts, this time including a proposed contract with Double "AA" and Love, were sent to Love at Frontier Days in Cheyenne, Wyoming in early August, 1972. Again the contracts were not returned and no work could proceed without the signed documents.

While the exact date is disputed, sometime in late August or September (more probably September), Fiakas was informed Love was at the Veterans Memorial Coliseum in Phoenix. The contracts were signed on that day, although dated in early August. At this time, only the preliminary drawings referred to earlier were completed. At the time of the contract signing, Fiakas told Love there was not enough time left to complete the project as set out in the contracts. They could not get the drawings prepared, the engineering done, brochures for equipment, obtain bids, etc. Nor could he guarantee any prices because of the lateness of the contract signing and the possible unavailability of materials at usual sources of supply on such short notice.

Against Fiakas' advice to forget about the project, Love told Fiakas to go ahead with it and get it completed prior to the fair, then some six to eight weeks away. The first plans were given to Double "AA" on October 3d and the work was begun the following day, continuing right up to October 28, 1972, a day or so after the fair had begun. All during this time Love was at various fairs and shows and efforts to keep in touch with him proved almost impossible until he returned to Phoenix a few days before the fair opened. Fiakas completed his drawings about October 15th. Love actually started to use the facility on October 27th, a day before Double "AA" finished working on the project. Unseasonal rains in October of 1972 caused additional problems in scheduling the work and availability of materials.

Although there is some discrepancy in the dates in the record, we believe there is ample evidence that Love, after receiving advice which indicated it would be impossible to timely complete the job with the formalities established in the contracts or to complete it at the cost he allegedly contemplated, nevertheless not only authorized but directed the architect to proceed with the project and get it done by the deadline.

Fiakas testified that he told Love the work could not be done for under $50,000 and that it would be in excess of $50,000, and Love should not get further involved unless he was prepared for it. Love's own expert at trial testified to a cost of at least $65,000. Schwann testified he could have done it for $95,000 had it not been for the short completion time and the unprecedented weather. The jury returned a $97,626.00 verdict ($47,626.00 plus the $50,000 already paid by Love).

■ Obviously the parties to these written contracts could subsequently modify them by oral agreements. *In re Estate of MacDonald*, 4 Ariz.App. 94, 417 P.2d 728, 36 A.L.R.3d 682 (1966); *American Eagle Fire Insurance Company v. McKinnon*, 36 Ariz. 409, 286 P. 183 (1930). Likewise it is clear that Love could, and did, waive most of the conditions requiring his approval after his last contact with Fiakas. *Siegal v. Haver*, 4 Ariz.App. 119, 417 P.2d 928 (1966). The jury resolved all of these issues except for the claimed approximately $10,000 in excessive costs occasioned by the rain and tight schedule, against Love. The evidence clearly supports these resolutions and we will not now disturb them.

## JURISDICTION

The most troublesome aspect of this matter is the issue of the license or licenses of Double "AA". A.R.S. § 32–1153 is very clear:

"No contractor shall act as agent or commence or maintain any action in any court of the state for collection of com-

pensation for the performance of any act for which a license is required by this chapter without *alleging and proving* that the contracting party whose contract gives rise to the claim was a duly licensed contractor when the contract sued upon was entered into and when the alleged cause of action arose." (Emphasis added) Double "AA" alleged the necessary licenses and attempted to prove their existence. Love did not in any way object to the degree of that proof in the trial court, nor did he urge then or now that Double "AA" did not in fact hold the requisite licenses at the times required by A.R.S. § 32–1153, *supra*. Love now urges, for the first time, that since Double "AA" did not produce either the originals or copies of the licenses in effect at the time the contract was consummated and the work completed, this cause must be reversed for a new trial, citing as authority *Lee v. Molinsky*, 77 Ariz. 184, 268 P.2d 975 (1954) and *Chickering v. George R. Ogonowski Construction Co., Inc.*, 18 Ariz.App. 324, 501 P.2d 952 (1972).

While a reading of this record, as must have been the case in *Molinsky, supra* and *Chickering, supra*, leads to the almost certain conclusion that Double "AA" did in fact possess the necessary license or licenses at the requisite times, if the issue had been properly raised in the superior court, and no additional proof of a very specific nature been forthcoming, we would most assuredly have to reverse this case and remand it for a new trial, even though it is almost certain that Double "AA" had the requisite licenses at the times in question. Such are the clear strictures of *Molinsky, supra*, A.R.S. §§ 32–1153 and 32–1104A(3) are identical to the statutes considered in *Molinsky*, and the Supreme Court has not changed or modified the rules set out in that case.

Neither *Molinsky, supra,*, nor *Chickering, supra*, however, presented the fact situation which we here encounter. Quite clearly the only "jurisdictional" aspect of the statute is the pleading of the license. As the Supreme Court said in *Molinsky*:

"While the plaintiff [contractor] was presenting his case, he moved to amend his complaint 'to allege that plaintiff was and is, at all times mentioned herein, a duly licensed contractor in the State of Arizona.' *This cured the jurisdictional question raised by defendants.*

After the granting of the motion to amend, plaintiff, *over the objections of defendants*, placed in evidence the following exhibits: . . ." 77 Ariz. at 186, 268 P.2d at 976–77. (Emphasis added) The contractor thereafter proceeded to place into evidence an overwhelming array of documentary exhibits, as well as his own testimony which we believe would allow any trier of fact to come to the conclusion that the contractor was licensed at the times in question. Nevertheless, our Supreme Court held, in a decision they themselves have criticized as a misapplication of the best evidence rule, *see State v. Woolery*, 93 Ariz. 76, 86, 378 P.2d 751, 759 (1963), that only the actual license, or a certified copy as provided for in A.R.S. § 32–1104A(3), would be sufficient proof of the existence of a license as required in A.R.S. § 32–1153. Twenty-three years have passed and neither the legislature not the Supreme Court have modified that position.

In *Chickering, supra*, the requisite licenses were neither pleaded nor proven as set out in *Molinsky, supra*, although there was other evidence, as here, of proper licensure. In *Chickering* the Court of Appeals reversed with directions to allow the contractor to amend, if he chose to do so, and then have a new trial. In *Molinsky, supra*, the cause was remanded for a new trial. In each case we may presume the contractor proved his licensure as directed by the court and proceeded on the merits of his claim. Love urges that these decisions require us to make the same order here. We disagree.

In *Molinsky* the matter was raised in the trial court and the contractor tried but failed to prove his licensure in that the evidence presented was objectionable because it did not comply with the best evidence rule as viewed by the Supreme Court. The pleading was jurisdictional, the failure of the level of proof merely required that he try again. In *Chickering* there was no

allegation of licensure, hence no jurisdiction, *Molinsky, supra.* In the present case, where the trial court clearly had jurisdiction but the level of proof fell below that mandated by *Molinsky*, the matter was not pressed in the trial court at all and raised for the first time on appeal here. This case is one of first impression.

■ The purpose of A.R.S. § 32–1153 is to protect the public from unscrupulous or unqualified persons holding themselves out as having the capacity, knowledge and qualifications of a contractor. *Sobel v. Jones*, 96 Ariz. 297, 394 P.2d 415 (1964); *Miller v. Superior Court in and for the County of Pima*, 8 Ariz.App. 420, 446 P.2d 699 (1968). Even though some forfeiture may occur, the court has no equitable discretion to ignore this statute and allow an *unlicensed* contractor to recover on a construction contract otherwise valid. *Northen v. Elledge*, 72 Ariz. 166, 232 P.2d 111 (1951).

The converse principle is equally true; the statute was not intended to injure licensed contractors. Even in *Molinsky* and *Chickering*, the obviously licensed contractors were not thrown out of court but were given ample opportunity to comply with a rather simple, but very specific, standard of proof. With this in mind, we do not believe that the Arizona Supreme Court intended, absent the jurisdictional prerequisite of a proper allegation, that the degree of proof problem be excluded from the general rule, applied even to issues of fundamental or constitutional importance, that a matter must be first presented to the trial court for determination before it can be considered on appeal. *See generally Ruth v. Industrial Commission*, 107 Ariz. 572, 490 P.2d 828 (1971); *Porter v. Eyer*, 80 Ariz. 169, 294 P.2d 661 (1956) and authorities cited therein. Had Love not lain in the weeds to see how the trial would come out, the matter would have been easily cured in the trial court. *Cf. Siemens v. Meconi*, 44 Cal.App.2d 641, 112 P.2d 904 (1941). There being no pressing reason for us to make an exception to the general rule to consider an

issue not presented to the trial court, *Ruth v. Industrial Commission, supra,* and since the result would only be to unnecessarily prolong this litigation and not advance the purpose of A.R.S. § 32–1153, *supra,* we decline to review this issue, since it was not raised in the trial court. *Cf. B&P Concrete, Inc. v. Turnbow*, 114 Ariz. 408, 561 P.2d 329 (1977).

Although California long ago overruled even the jurisdictional aspect of the pleading on an almost identical statute, *Marogna v. Mitchell*, 104 Cal.App.2d 799, 233 P.2d 70 (1951), the language of that court in *Stephens v. Baker and Baker*, 150 Cal.App.2d 558, 310 P.2d 73 (1957) involving almost an identical issue, except regarding the pleading, is instructive:

> "In short, the statute requires the contractor to be a competent workman. It does not require him to be a better pleader than other litigants." 310 P.2d at 74 and 75.

■ Absent a *challenge* to the level of proof and subsequent failure of proof in the trial court, as in *Molinsky, supra,* we will not hear a complaint concerning the degree of proof of a contractor's license pursuant to A.R.S. § 32–1153, *supra,* for the first time in this Court.

The judgment is affirmed.

DONOFRIO, J., concurs.

HAIRE, Judge, specially concurring:

I concur in the result.